Nos. 20-1046, -2050

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

KYOCERA SENCO INDUSTRIAL TOOLS, INC.,
fka Kyocera Senco Brands Inc.,

*Appellant*,

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

KOKI HOLDINGS AMERICA LTD., fka Hitachi Koki U.S.A. Ltd.,

*Intervenor*.

KOKI HOLDINGS AMERICA LTD., fka Hitachi Koki U.S.A. Ltd.,

*Appellant*,

v.

INTERNATIONAL TRADE COMMISSION,

*Appellee*,

KYOCERA SENCO INDUSTRIAL TOOLS, INC.,
fka Kyocera Senco Brands Inc.,

*Intervenor*.

Appeal from the United States International Trade Commission in
Investigation No. 337-TA-1082

## BRIEF OF APPELLEE INTERNATIONAL TRADE COMMISSION

CLINT A. GERDINE
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone (202) 708-2310

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

SIDNEY A. ROSENZWEIG
Acting Assistant General Counsel
Telephone (202) 708-2532

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iv

STATEMENT OF RELATED CASES................................................1

STATEMENT OF THE ISSUES.......................................................1

STATEMENT OF THE CASE............................................................3

    I.    The Asserted Patents .........................................................4

        A.    The Asserted Claims ................................................5

        B.    The Patent Specification ..........................................8

            1.    The First Embodiment ....................................8

                a.    Safety Contact Element and Initiating a Driving Cycle...........................................10

                b.    Main Storage Chamber, Displacement Volume, and Driven Position ....................11

                c.    Lifter Member ..................................14

            2.    The Second Embodiment.....................................15

    II.    The Accused Products .................................................18

    III.    Proceedings Before the Commission ..............................19

        A.    Commission Findings Pertinent to Both Appeals.........19

            1.    The ALJ's *Markman* Order (Order No. 9) ..........19

            2.    The ALJ's Order (Order No. 28) Excluding Kyocera's Expert Testimony ...............................20

        B.    Commission Findings Pertinent to Kyocera's Appeal – The ALJ's Construction of "Driven Position"................23

        C.    Commission Findings Pertinent to Koki's Appeal ......24

            1.    The ALJ's Construction of "Lifter Member" ......24

            2.    The ALJ's Constructions of "Main Storage Chamber" and "Initiating a Drive Cycle" ............26

            3.    The ALJ's Initial Determination and Commission Review ..................................................26

            4.    The ALJ's Remand Initial Determination and Commission Review .....................................27

## TABLE OF CONTENTS (cont'd)

**SUMMARY OF THE ARGUMENT** .................................................29

    I.    Kyocera's Appeal:  The Driven-Position Patents ....................29

    II.   Koki's Cross-Appeal:  The '718 Patent ...................................30

**ARGUMENT** ...........................................................................32

**STANDARD OF REVIEW** .......................................................32

**ARGUMENT PERTAINING TO KYOCERA'S APPEAL** ............34

    I.    The Commission Did Not Abuse Its Discretion by Excluding Kyocera's Expert Testimony Pertaining to Infringement Under the Doctrine of Equivalents.................................................34

        A.    Kyocera Erred at, and After, the *Markman* Proceeding.................34

        B.    The ALJ Did Not Err in Excluding Kyocera's Expert Testimony Concerning Infringement Under the Doctrine of Equivalents.................................................37

        C.    Kyocera's Arguments Concerning Dr. Pratt's Ability to Channel a Person of Ordinary Skill Are Waived and Are at Odds with the Evidentiary Record ....................39

    II.    The Commission Properly Construed the "Driven Position" Limitation ...........................................................................41

**ARGUMENT PERTAINING TO KOKI'S APPEAL** ...........................45

    I.    The Commission Properly Construed the "Lifter Member" Limitation ...........................................................................45

    II.    The Commission Properly Applied the Undisputed Construction of the "Initiating a Driving Cycle" Limitation and Substantial Evidence Supports Its Finding That this Limitation Is Met by the Accused Products ...........................................................49

        A.    Koki's Arguments Are Waived and Are Unsupported Attorney Argument .........................................................50

        B.    Substantial Evidence Supports the Commission's Finding of Infringement .................................................................52

## TABLE OF CONTENTS (cont'd)

C.    Notwithstanding Waiver, Koki's Argument That the End of the Safety Contact Element Cannot Be Part of the Fastener Driver Mechanism Is Wrong.......................................................53

III.    The Commission Correctly Applied Its Construction of the "Main Storage Chamber" Limitation and Substantial Evidence Supports Its Finding That Pedicini Does Not Disclose This Limitation.................58

A.    The Pedicini Prior Art .....................................................................58

B.    The ALJ's Claim Construction and Finding of Non-Disclosure ..............................................................60

IV.    The Commission Did Not Abuse Its Discretion When It Considered Kyocera's Expert Testimony Pertaining to Literal Infringement and Invalidity......................................................63

CONCLUSION.........................................................................................66

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009) ...............................51

*AquaTex Indus., Inc. v. Techniche Sols.*,
    479 F.3d 1320 (Fed. Cir. 2007) ...................................................................*passim*

*Cisco Sys., Inc. v. ITC*, 873 F.3d 1354 (Fed. Cir. 2017)..........................................32

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*,
    501 F.3d 1254 (Fed. Cir. 2007) ........................................................................36

*Endress + Hauser, Inc. v. Hawk Measurement Sys.*,
    122 F.3d 1040 (Fed. Cir. 1997) ........................................................................39

*Finnigan Corp. v. ITC*, 180 F.3d 1354 (Fed. Cir. 1999) ............................39, 52, 63

*Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332 (Fed. Cir. 2003) ................................33

*Intel Corp. v. USITC*, 946 F.2d 821 (Fed. Cir. 1991).......................................32, 33

*Inventio AG v. Thyssenkrupp Elevator Americas*,
    649 F.3d 1350 (Fed. Cir. 2011) ........................................................................47

*Johns Hopkins Univ. v. CellPro, Inc.*,
    152 F.3d 1342, 1355 (Fed. Cir. 1998) ..............................................................57

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004) ...................................................................47, 48

*Mass. Inst. of Tech. v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006) ........................................................................46

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    347 F.3d 1367 (Fed. Cir. 2003) ........................................................................36

*MTD Products Inc. v. Iancu*, 933 F.3d 1336 (Fed. Cir. 2019) .........................48, 49

*Norgren Inc. v. ITC*, 699 F.3d 1317 (Fed. Cir. 2012).......................................34, 65

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................19, 34, 35, 50, 62

# TABLE OF AUTHORITIES (cont'd)

**Cases (cont'd)** **Page(s)**

*Retractable Techs. v. Becton, Dickinson & Co.*,
  659 F.3d 1369 (Fed. Cir. 2011) ........................................................37

*Robert Bosch, LLC v. Snap-On Inc.*,
  769 F.3d 1094 (Fed. Cir. 2014) ....................................24, 25, 46, 48

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
  594 F.3d 1360 (Fed. Cir. 2010) .............................................33, 63, 64

*Spansion, Inc. v. ITC*, 629 F.3d 1331 (Fed. Cir. 2010)...........................33

*Tessera Inc. v. ITC*, 646 F.3d 1357 (Fed. Cir. 2011)........................52, 57

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015)................................................................32, 33

*Williamson v. Citrix Online*, LLC,
  792 F.3d 1339 (Fed. Cir. 2015) (en banc) ..................................45, 48

*Winbond Elecs. Corp. v. ITC*, 262 F.3d 1363 (Fed. Cir. 2001) ...............33

**Statutes**

5 U.S.C. § 706(2) ...................................................................................32

19 U.S.C. § 1337.......................................................................................1

35 U.S.C. § 112....................................................................2, 25, 45, 48

**Rules**

Fed. R. Evid. 702 ...................................................................................64

## STATEMENT OF RELATED CASES

The present appeal and cross-appeal are from Appellee U.S. International Trade Commission's ("Commission's") final determination in *Certain Gas Spring Nailer Products and Components Thereof,* Inv. No. 337-TA-1082.  Apart from the proceedings Appellant Kyocera Senco Industrial Tools Inc. fka Kyocera Senco Brands Inc. ("Kyocera" or "Complainant") and Cross-Appellants Koki Holdings America Ltd. fka Hitachi Koki U.S.A. Ltd. ("Koki" or "Respondent") identified in their opening briefs, the Commission is not aware of any related cases.

## STATEMENT OF THE ISSUES

Kyocera appeals the Commission's final determination finding no violation of 19 U.S.C. § 1337 based on non-infringement and the preclusion of expert testimony concerning infringement under the doctrine of equivalents with respect to asserted U.S. Patent Nos. 8,267,296 ("the '296 patent"); 8,267,297 ("the '297 patent"); 8,286,722 ("the '722 patent"); and 8,602,282 ("the '282 patent") (collectively, "the Driven-Position Patents").  Kyocera's appeal raises two issues:

(1)    Whether the Commission abused its discretion in precluding Kyocera's expert from offering testimony concerning infringement under the doctrine of equivalents by finding that he did not have sufficient relevant technical expertise to be allowed to testify on this matter; and

(2)    Whether the Commission properly construed the term "driven

position" of the asserted Driven-Position Patents to mean "at the

bottom-most travel position" in accordance with the intrinsic record.

Koki appeals the Commission's final determination finding a violation of

section 337 based on its accused products literally infringing asserted claims 1, 10,

and 16 of U.S. Patent No. 8,387,718 ("the '718 patent").  Koki's cross-appeal

raises four issues:

(1)    Whether the Commission properly construed the term "lifter member"

not to be subject to 35 U.S.C. § 112, ¶ 6 where "lifter" connotes

structure and where the patent specification defines "lifter member."

(2)    Whether substantial evidence supports the Commission's finding that

the limitation "initiating a driving cycle" was met by Koki's accused

products based on an undisputed construction;

(3)    Whether substantial evidence supports the Commission's finding that

the asserted Pedicini prior art does not disclose "a main storage

chamber," where the agreed-upon construction for this term requires

that the chamber be "distinct" from the volume of the cylinder within

the driving tool; and

(4)    Whether the Commission abused its discretion in permitting

Kyocera's expert to offer testimony concerning literal infringement

- 2 -

and invalidity, which did not have the same difficulties and

complexities as the doctrine of equivalents.

## STATEMENT OF THE CASE

Kyocera's and Koki's Statements of the Case include an incomplete

description of all the relevant facts and findings before the Commission.  The

Commission therefore presents its own Statement of the Case.

The Commission instituted this investigation on November 20, 2017, based

on a complaint filed by Kyocera alleging, *inter alia*, Koki's infringement of the

five patents at issue on appeal.  Appx2.

On May 3, 2018, the presiding administrative law judge ("ALJ") issued a

*Markman* Order (Order No. 9) construing the relevant terms of the asserted

patents.  Appx211-261.  On October 24, 2018, the ALJ issued Order No. 28,

granting in part Koki's motion *in limine* to exclude Kyocera's expert testimony

concerning infringement under the doctrine of equivalents.  Appx267.  As the '718

patent was the only patent for which Kyocera alleged literal infringement, the

parties agreed that the evidentiary hearing, *i.e.*, trial, would go forward only as to

the '718 patent.  Appx2284.  On June 7, 2019, the ALJ issued an initial

determination ("ID") finding no violation of section 337.  Appx95.

On August 14, 2019, the Commission determined to review certain findings

of the ID and remanded other issues to the ALJ.  Appx4.  On October 28, 2019, the

- 3 -

ALJ issued a remand initial determination ("RID"), again finding no violation of section 337. Appx4. On December 12, 2019, the Commission reviewed certain findings of the RID. Appx5. On March 5, 2020, the Commission issued its final determination, finding a violation of section 337 based on induced infringement of the asserted claims of the '718 patent by Koki. Appx5-6. As a remedy, the Commission issued a limited exclusion order directed to infringing gas spring nailer products and components thereof, and a cease and desist order directed to Koki after considering the public interest. Appx4125-4141.

## I.    THE ASSERTED PATENTS

There are five asserted patents on appeal; all claim priority to the same provisional patent application and have substantially identical written descriptions. Although the asserted patents contain differences in the Summary of the Invention section, those differences are not relevant to the issues on appeal; the drawings, brief description of the drawings, and the detailed description of the invention are the same among the asserted patents.

The asserted patents are directed to portable linear fastener driving tools (or nailers) that can drive staples, nails, or other fasteners into a workpiece. Appx559 (1:17-19). Specifically, the disclosed invention is directed to driving tools that use a "gas spring" concept, in which pressurized air forces a piston through a driving

- 4 -

stroke movement, which ultimately drives a fastener into a workpiece. Appx559 (1:19-23); *see also* Appx512 (Abstract).

Prior art gas spring nailers suffer from various shortcomings, including having too many moving parts, requiring regular replenishment of pressurized gas during normal operation of the device that increases the risk of gas leaks, and requiring combustion of gas. Appx559 (1:38-62). The asserted patents purport to solve these problems by providing a specific configuration that uses a "working storage volume" comprising a combination of a main storage chamber and a cylinder displacement volume; this combination avoids the use of a gas replenishment system on-board the driving tool. Appx559 (2:19-26).

### A.    The Asserted Claims

As to the '718 patent, Kyocera alleged induced infringement of independent method claims 1, 10, and 16. Appx124. Asserted independent claim 1 of the '718 patent is representative of the asserted claims of that patent, and reads as follows, with the terms at issue on appeal italicized:

> 1. A method for controlling a fastener driving tool, said method comprising:
>
> (a)    providing a fastener driving tool that includes: (i) a housing; (ii) a system controller; (iii) *a safety contact element*; (iv) a user-actuated trigger; (v) a fastener; (vi) a prime mover that moves a lifter member which moves a driver member away from *an exit end of the mechanism*; and (vii) a fastener

driving mechanism that moves said driving member toward *said exit end of the mechanism*, said fastener driving mechanism including:

(A)    a hollow cylinder comprising a cylindrical wall with a movable piston therewithin, said hollow cylinder containing *a displacement volume created by a stroke of said piston*, and

(B)    *a main storage chamber that is in fluidic communication with said displacement volume of the cylinder*, wherein said main storage chamber and said displacement volume are initially charged with a pressurized gas;

(b)    selecting, by a user, an operating mode of said driving cycle to be one of:    a "bottom firing mode," and a "restrictive firing mode;" wherein

(i)    if said restrictive firing mode is selected, said tool will operate if said safety contact element has been actuated before said trigger actuator has been operated; and

(ii)    if said bottom firing mode is selected, said tool will operate if both:

(A)    said trigger actuator has been operated, and
(B)    said safety contact element has been actuated, in either sequence;

(c)    *initiating a driving cycle by pressing said exit end against a workpiece* and actuating said trigger, thereby causing said fastener driving mechanism to force the driver member to move toward said exit end and drive a fastener into said workpiece; and

(d)    actuating said prime mover, thereby moving said lifter member and causing said driver member to

> move away from said exit end toward a ready
> position.

Appx577 (37:52-38:25) (emphasis added).

The asserted claims from the Driven-Position Patents are apparatus claims.[1] All of the claims recite a "driven position," which does not appear in the asserted claims of the '718 patent. Claim 1 of the '296 patent is representative of the claims of the Driven-Position Patents, and recites in relevant part, with the "driven position" term at issue on appeal italicized:

> 1.    A fastener driving tool, comprising:
>
> * * *
>
> (d) a lifter member which exhibits a contact surface that, at predetermined locations along said contact surface, makes contact with said plurality of spaced-apart protrusions of said driver member such that, when said lifter member is moved in a first direction, it causes a return stroke of an operating cycle and moves said driver member from a *driven position* toward a ready position, and when said lifter member is moved to a holding position, it temporarily holds said driver member at said ready position by use of a holding contact between said lifter member and said driver member; and
>
> (e) a main storage chamber that is in fluidic communication with said displacement volume of the driver actuation device, wherein:

---

[1]    Kyocera asserted the following claims of the Driven-Position Patents: (1) claims 1 and 11 of the '296 patent; (2) claims 1 and 32 of the '297 patent; (3) claims 1 and 16 of the'722 patent; and (4) claim 1 of the '282 patent.  Appx219; Appx222-223; Appx228.

\* \* \*

> (ii) when actuated for a driving stroke of said operating cycle, said lifter member moves in said first direction from said holding position and releases said driver member from said holding contact, and said movable member of the driver actuation device is moved by said pressurized gas and moves said driver member from said ready position to said *driven position….*

Appx369 (40:18-64) (emphasis added).

## B.    The Patent Specification

As discussed above, the patents share a common specification for purposes of this appeal.  That specification discloses alternative embodiments.  *See, e.g.*, Appx560-562 (4:7-7:7) (Brief Description of the Drawings).  As will be discussed in the Argument, *infra*, Kyocera and Koki argue that differences between the embodiments are pertinent to the appeal.

### 1.    The First Embodiment

The first embodiment describes a fastener driving tool **10** that is designed to linearly drive fasteners such as nails and staples.  Appx562 (7:29-30).  It is illustrated in FIG. 1 of the patents:



## Fig. 1

Appx514 (FIG. 1).  The tool **10** includes a handle portion **12** (top center), a fastener driving portion **14** (top left), a fastener magazine portion **16** (bottom right), and a fastener exit portion **18** (bottom left).  Appx562 (7:30-32).  The driving tool **10** also includes a motor **40** (center right) which acts as a prime mover for the tool, and which has an output that drives a gearbox **42** (also center right).  The handle portion **12** includes a printed circuit board **50** (center) that contains a controller.  Appx562 (8:1-3, 10-12).  A trigger switch

**52** is activated by a trigger actuator **54**. Appx562 (8:12-13). As shown in FIG. 1 (above), the handle portion **12** is designed for gripping by a human hand, and the trigger actuator **54** is designed for linear actuation by a person's finger while gripping the handle portion **12**. Trigger switch **52** provides an input to the control system **50**. Appx562 (8:14-19).

On appeal, the parties dispute the limitations "a main storage chamber," "initiating a driving cycle," "driven position," and "lifter member." The "initiating a driving cycle" limitation also relates to the "safety contact element" limitation, and the "main storage chamber" limitation relates to the "displacement volume" limitation. Accordingly, the portions of the specification disclosing these limitations are discussed below. More detailed discussion of these limitations is presented *infra*, in the argument sections for Kyocera and Koki.

### a.    Safety Contact Element and Initiating a Driving Cycle

As shown above in FIG. 1, "[t]he area of the first embodiment [of the fastener driving] tool **10** in which a fastener is released is indicated approximately by the reference numeral **30**, which is the 'bottom' of the fastener exit portion of tool **10**." Appx562 (7:44-47). Before the tool is actuated, *i.e.*, before "initiating a driving cycle," a safety contact element **32** extends beyond the bottom **30** of the fastener exit, and this extension of the safety contact element is depicted at **34**,

"which is the bottom or 'front' portion of the safety contact element." Appx562 (7:47-51). The '718 specification discloses various types of firing (or driving) modes for using the tool **10** to drive fasteners into a workpiece. Appx565 (14:43-61). For any driving mode, the tool nose **34**, *i.e.*, the nose of the safety contact element **32**, is pressed against a work surface to cause the drive stroke to occur. Appx565 (14:43-55).

> **b.** **Main Storage Chamber, Displacement Volume, and Driven Position**

As shown in FIG. 2 below, the fastener driver portion **14** includes a working cylinder **71** that has a cylinder wall **70**, and within the wall **70** is a piston **80** interconnected to a driver **90**. Appx562 (8:29-33, 44-49).



## Fig. 2

Appx515 (FIG. 2).

Surrounding the cylinder wall is a main storage chamber **74**.  Appx562

(8:37-41).  In operation, the piston **80** moves up and down in the chamber **74**,

within the cylinder wall **70**, to deliver a driving stroke, via the driver **90**, to drive a

fastener into a workpiece, *i.e.*, a solid object.  Appx562-563 (8:44-49, 9:57-10:3).

Each driving, *i.e.*, downward, stroke of the piston **80** creates a displacement

volume **76** in the cylinder **70**, all within the chamber **74**, where this displacement

volume, as well as the volume of the main storage chamber, are at their combined

maximum when the piston **80**, as well as the driver **90**, are in their bottom-most

travel position, *i.e.*, "the driven position," as shown in FIG. 3 below.  Appx563

(10:22-27, 30-33).



Fig. 3

Appx516 (FIG. 3).

The specification defines the "displacement volume" as the portion

interior to the cylindrical wall **70** that is created by the stroke of the piston

**80**.  Specifically, with respect to the relationship between the main storage

- 13 -

chamber **74** and the displacement volume (or gas pressure chamber) **76**, the

specification discloses, with reference to FIG. 2 (shown above), that:

> It will be understood that the gas pressure chamber **76** and the main storage chamber (or storage space) **74** *are in fluidic communication with one another*. It will also be understood that the portion to the interior of the cylinder wall **70** *forms a displacement volume that is created by the stroke of the piston 80*. In other words, the gas pressure chamber **76** *is not a fixed volume*, but this chamber *will vary in volume as the piston 80 moves up and down* (as seen in FIG. **2**). This type of mechanical arrangement is often referred to as a "*displacement volume*," and that terminology will mainly be used herein for this non-fixed volume **76**.

Appx563 (9:60-10:3) (emphasis added); *see also* Appx515 (FIG. 2).

### c.   Lifter Member

The driving tool **10** also includes a rotary-to-linear lifter **100** that is

referred to as the "lifter member" or the "lifter." Appx562 (8:48-52). The

lifter **100** includes four protruding pins **104**, **106**, **108**, and **114**. Appx516

(FIG. 3). When the lifter rotates counterclockwise (as shown in FIG. 3

above), the pins come into contact with teeth **92** along the left side of the

driver **90**, serving to "lift" the driver upward in preparation for the driving

stroke. Appx563 (10:49-58). In the first embodiment, pin **114** protrudes

from a side opposite to those of the other pins and is used by the tool **14** to

sense the movement of the lifter **100** and trigger a locking feature for the

driver when it reaches a top-most, or "ready," position.  Appx563 (9:15-24);
Appx564 (11:7-11, 27-59).

### 2.    The Second Embodiment

On appeal, the parties dispute certain limitations with respect to the second
embodiment disclosed in the asserted patents.  Kyocera contends that the second
embodiment informs the construction for "driven position," Kyocera Br. 14-15, 21-
27, and Koki contends that this embodiment omits using the "nose" of the safety
contact element to actuate the tool, Koki Br. 15-16, 63-77.

FIGs. 16-18 and 20 of the '718 patent illustrate a second embodiment of a
fastener driving tool **401** that includes a safety contact element **418** (bottom right).
Appx568 (19:57-59; 20:10-14).  FIG. 16 shows a representative cross-section:



Fig. 16

Appx532 (FIG. 16).  In comparison to FIG. 1, where magazine housing **60** is

parallel to the work surface, the magazine housing **445** in FIG. 16 is placed at an

upward angle.  *Compare* Appx532 (FIG. 16) *with* Appx514 (FIG. 1).

The written description contains a passage regarding the safety contact

element **418** that is substantially identical to the passage for the first embodiment

but for numbering.  *Compare* Appx568 (20:10-14) ("Before the tool is actuated,

[the] safety contact element **418** extends beyond the bottom **417** of the fastener

exit, and this extension of the safety contact element is depicted at **419**, which is

the bottom or 'front' portion of the safety contact element.") *with* Appx562 (7:47-51) ("Before the tool is actuated, a safety contact element **32** extends beyond the bottom **30** of the fastener exit, and this extension of the safety contact element is depicted at **34**, which is the bottom or 'front' portion of the safety contact element.").

FIG. 20, which shows the piston, is substantially the same as FIG. 3:



Fig. 20

Appx536 (FIG. 20). The key difference between FIGs. 3 and 20, which is not at issue on appeal, is that the second embodiment uses a magnet **414**, instead of the

pin **114** of FIG. 3, to sense the movement of the lifter **400** and trigger the locking feature for the driver **490**. Appx569 (22:51-58). The patent contains the same description for FIGs. 3 and 16, stating that each figure is "another perspective view from the side . . . better showing the driver mechanism, with the piston at its lowest 'driven' position." Appx561 (5:5-9, 63-67). Likewise, the descriptions in the Detailed Description of the Invention are substantially the same, *compare* Appx563 (10:22-48) *with* Appx570 (24:9-36). Kyocera's opening brief contends that a difference in the two passages at Appx563 (10:22-27) and Appx570 (24:9-15) informs the meaning of "driven position." Kyocera Br. 12-15, 23-27. The Commission will address these passages in Part II of the Argument, *infra*.

## II.    THE ACCUSED PRODUCTS

Before the Commission, Kyocera accused five Koki gas spring nailers: the NT1850DE, NT1865DM, NT1865DMA, NR1890DC, and NR1890DR nailers (collectively, "the accused products"). Appx2305; *see also* Appx105. The differences among those products are not pertinent to the issues on appeal. The NT1865DM is pictured at a high level below:



Appx3979.  In the accused products, the exit end of the mechanism, *i.e.*, the end of

the push lever (or safety contact element), is pressed against the workpiece to

allow a driving cycle to begin.  Appx3970; *see also* Appx799 (Q/A 203).

## III.    PROCEEDINGS BEFORE THE COMMISSION

### A.    Commission Findings Pertinent to Both Appeals

#### 1.    The ALJ's *Markman* Order (Order No. 9)

Patent claims are construed from the vantage point of a person of ordinary

skill in the art at the time of the invention ("POSA").  *Phillips v. AWH Corp.*, 415

F.3d 1303, 1313 (Fed. Cir. 2005).  In *Markman* proceedings before the ALJ, Koki

submitted that:

> [a] person of ordinary skill in the art relevant to the
> Asserted Patents would have either (i) a Master's Degree
> in mechanical engineering with at least two years of

- 19 -

experience in power[ed] nailer design; (ii) a Bachelor's Degree in mechanical engineering with at least five years of experience in powered nailer design; or, (iii) ten or more years of experience in powered nailer design. This experience in powered nailer design would include mechanical design, tool design, manufacturing, mechanics of materials, stress analysis, ergonomics, and human factors.

Appx217; Appx1476 (citing Appx1525-1526 (¶ 22)). Kyocera did not offer a level of ordinary skill, nor did it identify any fault with Koki's proffered level of ordinary skill. Kyocera's expert, Dr. John D. Pratt, applied only Koki's level of ordinary skill for Kyocera's proposed claim constructions. Appx217 (citing Appx1676 (¶¶ 24-25)). The *Markman* Order adopted Koki's proposed level of ordinary skill in the art. Appx217-218. Specific claim constructions pertinent to this appeal are discussed, *infra*, in connection with the Commission's findings. The ALJ's claim construction for "lifter member" is discussed below in the subsection entitled "Commission Findings Relevant to Kyocera's Appeal." The ALJ's construction of "driven position," "main storage chamber," and "initiating a driving cycle" are discussed below in the subsection C below, entitled "Commission Findings Pertinent to Koki's Appeal," and in the Argument.

### 2.     The ALJ's Order (Order No. 28) Excluding Kyocera's Expert Testimony

Discovery, including expert discovery, continued after the *Markman* proceedings. Based on that discovery, Koki argued that Kyocera's expert, Dr.

Pratt, lacked the relevant skill in the art and could not testify from the perspective of a POSA. Prior to the evidentiary hearing, Koki filed a motion *in limine* to exclude the entirety of Dr. Pratt's testimony on literal infringement, infringement under the doctrine of equivalents, and invalidity. Appx262. Specifically, Koki argued that Dr. Pratt had no skill in the field of "powered nailer design"—as required by the findings in the *Markman* Order—and was "not capable of analyzing the issues of infringement or invalidity from the perspective of a person of ordinary skill." Appx2252. In its opposition, Kyocera responded:

> *First*, Respondent ignores Dr. Pratt's significant experience in handheld power tools and fastener driving systems. *Second*, Respondent attempts to unduly narrow the scope of the "pertinent art" which, according to Respondent, conveniently disqualifies Complainant's technical expert. *And third*, Respondent mischaracterizes the standard for determining whether a witness may testify as a technical expert in patent cases.

Appx2268 (emphasis in original). Kyocera also asserted that "the level of ordinary skill in the art is disputed" and that the previously issued *Markman* Order determining such level of skill in the art was a "preliminary ruling." Appx263 (citing Appx2271).

The ALJ, however, explained that the *Markman* Order was "<u>not</u> preliminary," and ruled that he would not revisit this issue of the level of ordinary skill in the art because Kyocera chose not to dispute Koki's level of skill in the art in the *Markman* phase itself and for five months thereafter. Appx263 (emphasis in

original).  After finding that Kyocera's arguments disputing the level of ordinary skill in the art as adopted by the *Markman* Order were waived as untimely, the ALJ found that Dr. Pratt did not qualify as a POSA.  Appx264.  Specifically, the ALJ found that there was no dispute as to Dr. Pratt's lack of experience in the field of powered nailer design.  Appx264.

The ALJ then turned to whether Dr. Pratt's testimony should be excluded. Appx265-267.  After analyzing the relevant caselaw, the ALJ found that infringement under the doctrine of equivalents places particular emphasis on the POSA.  Appx266.  The ALJ quoted this Court's decision in *AquaTex Industries, Inc. v. Techniche Solutions*, 479 F.3d 1320 (Fed. Cir. 2007), for the proposition that "the difficulties and complexities of the doctrine" of equivalents, "as opposed to literal infringement," "require[] that evidence be presented through the particularized testimony of a person of ordinary skill in the art."  Appx266 (quoting *AquaTex*, 479 F.3d at 1329).  The ALJ otherwise determined to allow Dr. Pratt's testimony as to other issues less reliant upon the knowledge of a POSA. Appx266.  The ALJ reserved a decision on whether to allow Dr. Pratt's testimony in connection with literal infringement.  Appx267 (n.3).[2]

---

[2]    The ALJ and Commission ultimately considered Dr. Pratt's testimony on literal infringement.  *See, e.g.*, Appx38-44.

Accordingly, in Order No. 28 the ALJ granted in part Koki's motion *in limine*, striking Dr. Pratt's testimony with respect to the doctrine of equivalents (for infringement and for the technical prong of the domestic industry requirement) regarding the Driven-Position Patents. Appx267. Following Order No. 28, the parties agreed that further proceedings should be limited to the '718 patent, the only patent for which Kyocera asserted literal infringement based on the ALJ's claim constructions. Appx2284. Thus, the evidentiary hearing moved forward only with respect to the '718 patent. Appx96-97; Appx99.

## B.   Commission Findings Pertinent to Kyocera's Appeal – The ALJ's Construction of "Driven Position"

Before the ALJ, the parties disputed the meaning of "driven position," a term that appears only in the asserted claims of the Driven-Position Patents. Appx233-234. The parties' dispute centered on whether the driven position is *at* its bottom-most travel position, as Koki proposed, or merely *near* its bottom-most travel position, as Kyocera proposed. Appx234. The ALJ, agreeing with Koki, found that the specification, *e.g.*, of the '296 patent, defines this term:

> Referring now to FIG. **3**, *the piston is depicted at its bottom-most travel position*, and in this configuration, the displacement volume **76** and the main storage chamber **74** are at their largest combined volumes, while the cylinder venting chamber **94** is at its minimum volume. *This bottom position is also sometimes referred to herein as the "driven position."* In FIG. **3**, the movable piston stop **82** is now in contact with the stationary piston stop **84**, which

- 23 -

> is why the cylinder venting chamber 94 is at its minimum (or zero) volume. *In FIG. 3, the driver 90 is also at its bottom-most travel position*, and its lower-most tip can be seen extending out the exit port at the bottom of the guide body **36**.

Appx234-235 (emphasis by the ALJ); *see also* Appx355 (12:56-67).

The ALJ also found that, contrary to Kyocera's contention, nowhere does the specification define "the driven position as being *near* the bottom." Appx235 (emphasis in original); *see also* Appx307 (FIG. 3); Appx327 (FIG. 20); Appx353 (7:42-46, 8:33-37); Appx355 (12:56-67); Appx362 (26:43-54). Accordingly, the ALJ construed "driven position" to mean "at the bottom-most travel position." Appx235.

### C.   Commission Findings Pertinent to Koki's Appeal

### 1.   The ALJ's Construction of "Lifter Member"

Before the ALJ, the parties disputed the proper construction of the limitation "lifter member" that appears in the asserted claims of the '718 patent. Appx245-247. Koki argued that "lifter member" should be construed as a means-plus-function term. Appx246; Appx1485-1488 (citing, *inter alia*, Appx1541 (¶ 55-56)). Kyocera argued that: (1) it is presumed that "lifter member" is not drafted in means-plus-function format because the word "means" does not appear in the claim; and (2) the presumption is not overcome here because the intrinsic record

provides structure for the term.  *See* Appx246-248; Appx1450-1451 (citing *Robert Bosch, LLC v. Snap-On Inc.,* 769 F.3d 1094, 1097 (Fed. Cir. 2014)).

The ALJ determined that "lifter member" is not subject to 35 U.S.C. § 112, ¶ 6.  Appx247-248.  The ALJ found that the intrinsic record here informs a POSA's understanding of the term to recite a sufficiently definite structure.  Appx247-248.  In proceedings before the ALJ, Koki's own expert recognized that the term "lifter member" was definite and connoted structure:

> Based on the claims, drawings, and the specification passage above, *skilled artisans would have understood* that "lifter member" *means a rotating element where contact is made at the face surface and not at the outer perimeter.*  The outer shape would have been "understood" as unimportant, because no lifting contact is made at the outer perimeter.  Furthermore, because the outer shape is unimportant to the function recited, *skilled artisans would have understood* that the rotating element (that carries the contact surface on its face surface) *can take the form of a gear* (*i.e.*, a rotatable body with a round outer shape) *or a cam* (*i.e.*, any rotatable body with an eccentric outer shape).

Appx248 (quoting Appx1612 (¶ 91)) (emphasis added); *see also* Appx248 (citing Appx1682-1683 (¶ 43) (Kyocera's expert)).

After determining that "lifter member" is not subject to § 112, ¶ 6, the ALJ, based on the intrinsic record, construed this term to mean "a rotatable component having lifting pins on its face surface."  Appx254 (emphasis omitted).

## 2. The ALJ's Constructions of "Main Storage Chamber" and "Initiating a Drive Cycle"

The term " a main storage chamber" appears in the asserted claims of the

'718 patent and the parties agreed to construe this term to mean "a chamber that is

distinct from the volume of the cylinder and contains part of the working air

volume during operation." Appx229. This term is at issue in Koki's appeal in

connection with obviousness. Koki Br. 16-19, 23-24, 78-88. The term "initiating

a driving cycle" also appears in the asserted claims of the '718 patent (Appx226-

227) and its construction was not in dispute by the parties. Accordingly, the ALJ

construed this term in accordance with its plain and ordinary meaning. Appx213-

214.

## 3. The ALJ's Initial Determination and Commission Review

On June 7, 2019, the ALJ issued his final ID finding no violation of section

337, which confirmed no violation as to the Driven-Position Patents as described

*supra*. Appx95; Appx99. Specifically, with respect to infringement, the ALJ

analyzed only the "system controller" limitation of the asserted claims of the '718

patent and found that it was not met by Koki's accused products. Appx120-124.

The ALJ also noted that, in making his determination that the accused products do

not meet the "system controller" limitation, Koki's expert did not dispute that the

accused products meet all other limitations of the asserted claims of the '718 patent

except for lifter member.  Appx120 (n.11) (citing Appx3924-3925 (Q/A 317-20) (Dr. Vallee)).

The ALJ found that Koki did not demonstrate clearly and convincingly that the asserted claims of the '718 patent are obvious over Pedicini (U.S. Patent App. Pub. No. 2006/0180631) (Appx2459-2472) in view of Ellingham (U.S. Patent No. 860,536), and in combination with one of Forster (U.S. Patent App. Pub. No. 2005/0217875), Shima (U.S. Patent No. 7,494,036), or the Operating Instructions that accompanied Kyocera's Cordless Finish 41 Nailer (collectively, "Pedicini combination").  Appx130; Appx136-141.  Relevant to Koki's appeal, the ALJ found that Pedicini does not disclose the "main storage chamber" limitation of the asserted claims, and therefore the asserted claims are not rendered obvious in view of Pedicini in combination with other asserted prior art.  Appx136-141.

On August 14, 2019, the Commission, *inter alia*, determined not to review Order No. 28, determined to review the ID's finding of non-infringement, and remanded the investigation to the ALJ to assess infringement with respect to the other limitations of the asserted claims of the '718 patent.  Appx2; Appx4.

### 4.    The ALJ's Remand Initial Determination and Commission Review

On October 28, 2019, the ALJ issued a remand ID ("RID"), again finding no violation of section 337.  Appx208.  The ALJ found, *inter alia*, that while Koki's

accused products do meet the "lifter member" limitation, they do not meet the "displacement volume" or "initiating a driving cycle" limitations.[3]  Appx4; Appx177-179; Appx182-184; Appx189-191.    Relevant to the "initiating a driving cycle" limitation and Koki's cross-appeal, the ALJ struck Koki's expert's rebuttal testimony regarding infringement of this limitation.  Appx3223.  The ALJ found that Koki violated Ground Rules by introducing rebuttal expert testimony that exceeded its non-infringement contentions by presenting a previously unraised non-infringement theory, *i.e.*, that the "fastener driving mechanism" and "the safety contact element" cannot be part of the same element.  Appx3223; *see* Appx1841-1842.

On December 12, 2019, the Commission determined to review, *inter alia*, the RID's finding of non-infringement.  Appx5.  On March 5, 2020, upon review of the RID, the Commission found a violation of section 337 because Koki's customers directly infringe the asserted claims of the '718 patent when they use the accused products, and Koki induces that infringement.  Appx5-6.  As a remedy, the Commission issued a limited exclusion order directed to infringing gas spring nailer products and components thereof, and a cease and desist order directed to Koki.  Appx4125-4141.  Both Kyocera and Koki filed timely appeals.

---

[3]    On appeal, Koki does not dispute that its accused products meet several limitations including "system controller" and "displacement volume."

## SUMMARY OF THE ARGUMENT

## I.    KYOCERA'S APPEAL:  THE DRIVEN-POSITION PATENTS

Kyocera's appeal presents two issues:  the construction of the term "driven position" for the Driven-Position Patents, and the Commission's determination to exclude Kyocera's expert, Dr. Pratt, from testifying as to infringement under the doctrine of equivalents.  Kyocera fails to demonstrate reversible error as to either issue.

As to "driven position," the Commission correctly found that the specification equates this term with the bottom-most travel position of the driver:  "[t]his bottom position is *also sometimes referred to herein as the 'driven position.' . . . [wherein] the driver **90** is also at its bottom-most travel position*."  Appx355 (12:60-61, 12:65) (emphasis added).  Should the Court affirm the Commission's construction of this term, Kyocera acknowledges that the accused products do not literally infringe the asserted claims of the '718 patent.  Kyocera Br. 3, 27.

Because the accused products do not literally infringe under the proper construction of "driven position," Kyocera wished to rely on a fallback infringement argument under the doctrine of equivalents.  But at the *Markman* stage, Kyocera did not challenge Koki's proposed level of skill, Kyocera itself applied that level of skill as to claim construction, and the ALJ adopted it.  Nearly

a half-year later, Kyocera collaterally attacked that level of skill when it became

evident that its expert, Dr. Pratt, could not offer testimony from the vantage point

of a POSA. The Commission's exclusion of Dr. Pratt's testimony concerning

infringement under the doctrine of equivalents was not manifest error, as Kyocera

must (and cannot) demonstrate on appeal.

## II.    KOKI'S CROSS-APPEAL:  THE '718 PATENT

The Commission correctly construed the '718 patent claim terms at issue in

accordance with the intrinsic record. Regarding the term "lifter member," the

claim language and the specification demonstrate that "lifter member" connotes

structure. The patent specification defines "lifter member" as "lifter," and as

"rotary-to-linear lifter." Appx562 (8:50-52). Accordingly, the ALJ construed the

term as "a rotatable component having lifting pins on its face surface," which is the

understood meaning of rotary-to-linear lifter. Appx254 (emphasis omitted).

Moreover, Koki's own expert acknowledged that the term "lifter member"

connoted structure and that a POSA "*would have understood* that 'lifter member'

*means a rotating element where contact is made at the face surface and not at the*

*outer perimeter*." Appx1612 (¶ 91) (emphasis added). Should the Court affirm the

Commission's construction of this term, Koki does not dispute that the accused

products meet this limitation of the asserted claims of the '718 patent.

Koki contends that the "initiating a driving cycle" limitation is not met by its accused products. Koki Br. 65-68. Koki argues that the disclosed second embodiment in the '718 patent initiates a driving cycle by pressing the bottom portion of the fastener release exit of the driving tool against a workpiece, rather than pressing the nose of the safety contact element against a workpiece as disclosed by the first embodiment. However, contrary to Koki's argument, in each embodiment of the '718 patent, the nose of the safety contact element (which is part of the recited "fastener driving mechanism") is pressed against the workpiece to initiate a driving cycle.

Koki also contends that the limitation "main storage chamber" is disclosed by the Pedicini prior art, but Koki uses a construction contrary to the construction that it agreed to before the ALJ. Koki Br. 78-88. Properly applying the agreed-upon construction, the Commission correctly found that Pedicini does not disclose this limitation as its main storage chamber is not distinct from its displacement volume of the cylinder.

Should the Court affirm the Commission's applications of the constructions of "initiating a driving cycle" and "a main storage chamber," Koki admits that its accused products infringe the asserted claims of the '718 patent. Koki Br. 77-78, 83. Accordingly, substantial evidence supports the Commission's finding of

infringement and lack of disclosure by Pedicini, thereby also not meeting the clear and convincing standard for invalidity.

Finally, the Commission did not abuse its discretion in permitting Kyocera's expert, Dr. Pratt, to testify as to literal infringement and invalidity. The ALJ excluded Dr. Pratt's testimony where the reliance on a POSA was most important—infringement under the doctrine of equivalents—as opposed to literal infringement and the differences between the claims and the prior art for obviousness, as is at issue in Koki's appeal. In fact, many of the issues relating to literal infringement and obviousness were not disputed. Koki fails to demonstrate that the ALJ's careful attention to the few remaining disputed issues and the role of expert testimony with regard thereto was manifest error.

## ARGUMENT

## STANDARD OF REVIEW

In accordance with the Administrative Procedure Act, 5 U.S.C. § 706(2), this Court reviews the Commission's legal determinations *de novo*. *See*, *e.g.*, *Intel Corp. v. USITC*, 946 F.2d 821, 834 (Fed. Cir. 1991). The ultimate question of the proper construction of the patent claims is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). Any factual determinations made in support of a claim construction are reviewed for clear error. *Cisco Sys., Inc. v. ITC*, 873 F.3d 1354, 1360 (Fed. Cir. 2017). Such factual determinations can

include when a tribunal "resolves a dispute between experts and makes a factual finding that, in general, a certain term of art had a particular meaning to a person of ordinary skill in the art at the time of the invention." *Teva*, 574 U.S. at 332 (quotation omitted). Also, "[s]imply because a factual finding may be nearly dispositive does not render the subsidiary question a legal one." *Id.* at 333.

Infringement is a finding of fact, and is therefore reviewable under the "substantial evidence" standard. *See, e.g.*, *Intel*, 946 F.2d at 832. Under the substantial evidence test, the Court "must affirm a Commission determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion." *Spansion, Inc. v. ITC*, 629 F.3d 1331, 1344 (Fed. Cir. 2010) (quotation omitted). "Substantial evidence has been defined as more than a mere scintilla and as such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Honeywell Int'l, Inc. v. ITC*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (quotations omitted).

The Federal Circuit reviews evidentiary rulings of the Commission for an abuse of discretion. *See, e.g.*, *Winbond Elecs. Corp. v. ITC*, 262 F.3d 1363, 1370 (Fed. Cir. 2001). This Court has stated that it "will not disturb a [lower] court's evidentiary rulings unless manifestly erroneous." *SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010) (quotation omitted).

As to invalidity, obviousness is a question of law based on underlying facts, among which are the scope and content of the prior art and the differences between the claims and the prior art. *E.g., Norgren Inc. v. ITC*, 699 F.3d 1317, 1322 (Fed. Cir. 2012). Such factual determinations are reviewed for substantial evidence. *Id.* at 1321.

## ARGUMENT PERTAINING TO KYOCERA'S APPEAL

## I. THE COMMISSION DID NOT ABUSE ITS DISCRETION BY EXCLUDING KYOCERA'S EXPERT TESTIMONY PERTAINING TO INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

As discussed in the Statement of the Case, *supra*, in his *Markman* Order, the ALJ found that the appropriate level of ordinary skill in the art encompasses persons with certain education as well as specific experience in "powered nailer design." Appx217. The ALJ ruled that Kyocera's expert, Dr. Pratt, who had no experience in this field, would not be permitted to testify as to infringement under the doctrine of equivalents because Dr. Pratt did not have experience in "powered nailer design" to testify with regard to the understanding of a POSA. Appx265-267. Kyocera fails to demonstrate manifest error in the ALJ's determination.

### A. Kyocera Erred at, and After, the *Markman* Proceeding

It is undisputed that claim construction must be conducted through the eyes of a POSA. *See, e.g.*, *Phillips*, 415 F.3d at 1332 ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed.")

(quotation omitted).  In its *Markman* briefing, Koki proposed a level of ordinary skill in the art requiring "experience in powered nailer design," and provided testimony from its technical expert, Dr. Vallee.  Appx1476 (citing Appx1525-1526 (¶ 22)).  On the other hand, Kyocera did not address the level of ordinary skill in the art in its *Markman* briefing, but its expert, Dr. Pratt, stated in his declaration that he met the level of ordinary skill proposed by Koki and applied this level for his proposed claim constructions.  Appx217 (citing Appx1676 (¶¶ 24-25)).  Moreover, during the *Markman* Hearing, Kyocera adopted Koki's proposed level of ordinary skill in the art as it argued how "one of ordinary skill in the art *in the field of pneumatic nailers* would understand" the claims.  Appx1799 (72:3-5) (emphasis added).

On May 3, 2018, the ALJ adopted Koki's proposed level of skill in the art, and found "that one of ordinary skill in the art would have" the level of skill set forth by Koki.  Appx217-218.

Kyocera's litigation strategy on this issue was replete with mistakes that do not demonstrate manifest error by the ALJ.  Prior to the *Markman* hearing, Kyocera had a number of options it chose not to pursue:  Kyocera could have offered its own level of skill in the art; Kyocera could have disputed Koki's level of skill in the art; Kyocera could have argued that the level of skill in the art was immaterial to any of the claim terms in dispute; or Kyocera could have asserted

that a determination of the level of skill in the art was disputed and required factfinding.[4]  It did none of these things.  Then, after the *Markman* order issued—and determined the level of skill in the art for the asserted patents—Kyocera did nothing in the five months from the time of the *Markman* Order until its pre-hearing brief, filed shortly before the hearing commenced.

It was incumbent on Kyocera to ensure that its chosen expert would be capable of opining from the vantage point of one of ordinary skill.  The proper procedural time period for challenging Koki's proposed level of skill in the art was in connection with the *Markman* hearing.  Had Kyocera presented its position at that appropriate juncture, the ALJ could have considered a challenge by Kyocera to Koki's proposed level of skill and any competing Kyocera proposal as to level of skill.  By Kyocera's failure to so challenge Koki's proposed level of skill definition in the *Markman* proceeding, the ALJ did not err in adopting Koki's undisputed

---

[4]    Kyocera's brief (Kyocera Br. 33-35) has an extensive discussion about how determination of the level skill in the art can be a difficult factual question. Pointing to *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254 (Fed. Cir. 2007), Kyocera argues that the level of skill should have been an issue at the hearing.  But hearings are for resolving *disputed* factual issues, and based on Kyocera's conduct at the *Markman* hearing, the appropriate level of skill was not disputed.  *Daiichi* itself acknowledges that in an earlier case, "the level of skill in the art was not disputed by the parties" and it therefore "simply accepted the district court's finding."  501 F.3d at 1257 (discussing *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367 (Fed. Cir. 2003)).  As discussed in the text, if Kyocera wanted to take issue with Koki's proposed level of skill in the art, the time for doing so was in connection with the *Markman* proceeding.

level of skill definition.  Kyocera's mistakes and inaction do not leave it free to disparage the *Markman* findings as "preliminary," or to collaterally attack the level of skill determination therein in its opposition to Koki's motion *in limine* to exclude Dr. Pratt's testimony.

Cases are frequently won and lost at the *Markman* stage.  This Court, the Commission, and the parties, are well aware of that.  *See generally, e.g.*, *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 659 F.3d 1369, 1370 (Fed. Cir. 2011) (Moore, J., dissenting) ("Claim construction is the single most important event in the course of a patent litigation.  It defines the scope of the property right being enforced, and is often the difference between infringement and non-infringement, or validity and invalidity.").  The ALJ did not err in turning away Kyocera's collateral attack on his earlier finding for the level of ordinary skill.

### B.    The ALJ Did Not Err in Excluding Kyocera's Expert Testimony Concerning Infringement Under the Doctrine of Equivalents

Based on the level of skill in the art, Kyocera fails to demonstrate manifest error in the ALJ's exclusion of Kyocera's expert testimony concerning the doctrine of equivalents.  It is undisputed that Kyocera's expert Dr. Pratt lacks the level of skill himself.  Nor did Kyocera or Dr. Pratt ever explain how, without having such level of skill himself, Dr. Pratt could opine from the vantage point of such a

person.  Even in the face of Koki's motion to exclude, Kyocera did not, for example, offer evidence that Dr. Pratt had met with those who were themselves of ordinary skill in the powered-nailer field at the relevant date in order to bolster Dr. Pratt's understanding of the vantage point of a POSA.  Instead, Kyocera collaterally attacked the level-of-ordinary-skill finding, and argued that Dr. Pratt's skill, while inadequate, was close enough.

As discussed in the Statement of the Case, *supra*, the ALJ determined to "err[] in favor of" Kyocera and to allow some of Dr. Pratt's testimony where it was less reliant upon the vantage point of a POSA.  Appx162.  (Koki's cross-appeal challenges such admission, and is discussed, *infra*, in connection with that cross-appeal.)  Nonetheless the ALJ determined to exclude Dr. Pratt's testimony concerning infringement under the doctrine of equivalents because of that doctrine's particular reliance on the knowledge of a POSA.  The ALJ's exclusion decision was not error, much less manifest error.

This Court in *AquaTex* stated:

> Both the Supreme Court and this court have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art . . . . [W]hile many different forms of evidence may be pertinent, when the patent holder relies on the doctrine of equivalents, as opposed to literal infringement, the difficulties and complexities of the doctrine *require* that evidence be presented to the jury or other fact-finder through the *particularized testimony* of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-

limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents.

479 F.3d at 1329 (quotation omitted and emphasis added).  There is no "manifest error" here in the ALJ's decision to exclude Kyocera's expert testimony with respect to the doctrine of equivalents.

### C.    Kyocera's Arguments Concerning Dr. Pratt's Ability to Channel a Person of Ordinary Skill Are Waived and Are at Odds with the Evidentiary Record

On appeal, Kyocera argues that Dr. Pratt's testimony should have been allowed because the POSA is a hypothetical construct.  Kyocera Br. 28-32.  In Commission proceedings, however, Kyocera only presented arguments that its expert testimony should be admitted because the level of ordinary skill in the art adopted by the ALJ was determined without any factual analysis, or was overly narrow.  Appx2425-2429.  Accordingly, Kyocera's arguments on those pages of its brief—including its reliance on *Endress + Hauser, Inc. v. Hawk Measurement Sys.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997)—are waived and should not be addressed by this Court.  *See, e.g.*, *Finnigan Corp. v. ITC*, 180 F.3d 1354, 1362-63 (Fed. Cir. 1999).  In any event, *Endress* is a case in which the Court found that the district judge's decision to allow certain testimony fell within the scope of the district court's discretion, and not that exclusion of such testimony would have exceeded such discretion.  *Endress*, 122 F.3d at 1042.

Not only is Koki's legal argument waived, but the factual underpinnings have been waived, too. Nowhere in Commission proceedings did Kyocera explain how, if Dr. Pratt were permitted to testify, Dr. Pratt could opine from the vantage point of a POSA. Even in the face of Koki's motion to exclude (or in its rebuttal brief on claim construction), Kyocera did not offer evidence as to how Dr. Pratt would possess the knowledge of a POSA, as for example, by having consulted with persons who were themselves of ordinary skill in the powered-nailer field at the relevant date in order to bolster Dr. Pratt's understanding of the vantage point of a POSA.

In Kyocera's rebuttal brief on claim construction, Kyocera included a declaration from Dr. Pratt where he stated, after acknowledging Koki's proposed level of ordinary skill that included experience in "powered nailer design," that "I meet *this level of skill* and *have applied it* in reaching my conclusions found in this declaration." Appx1706 (¶¶ 24-25) (emphasis added). Later in proceedings, Kyocera merely stated that Dr. Pratt "has significant industry experience related to fastener driving tools" and that there is "overlap" between powered nailers and general fastener driving tools. Appx2269; Appx2271-2272. Furthermore, Kyocera simply asserted that "Dr. Pratt is qualified to testify as an expert witness regardless of the level of ordinary skill in the art," but did not proffer any specifics as to how

exactly he would be capable of opining from the vantage point of one of ordinary skill as already determined by the ALJ.  Appx2272 (Subheading B).

Based on the foregoing, there is no "manifest error" in the ALJ's determination to exclude Kyocera's expert testimony regarding infringement under the doctrine of equivalents with respect to the Driven-Position Patents.  Kyocera failed to oppose a level of ordinary skill in the art that excluded its own expert's opinions, and now suffers the consequences of that choice.  Moreover, Kyocera's invitation for the Court to apply a different standard for the level of skill in connection with infringement and invalidity than was applied in claim construction calls into question the Commission's claim constructions themselves.  The Commission respectfully requests that the Court deny Kyocera the mulligan it seeks.

## II.    THE COMMISSION PROPERLY CONSTRUED THE "DRIVEN POSITION" LIMITATION

Representative claim 1 of the '296 patent recites in relevant part, "when said lifter member is moved in a first direction, it causes a return stroke of an operating cycle and moves said driver member from a driven position toward a ready position."  Appx369 (40:36-39).  The plain language of the claim defines the "driven position" as the position the driver member is at before it returns to a ready position with a return stroke via the lifter member, *i.e.*, after a driving stroke.  The

ALJ properly construed the term "driven position" to mean "at the bottom-most travel position" in accordance with the intrinsic record based on the teachings of this Court. Appx235.

The specification defines "driven position" as the "bottom position." The '296 patent explains:

> Referring now to FIG. **3**, *the piston is depicted at its bottom-most travel position*, and in this configuration, the displacement volume **76** and the main storage chamber **74** are at their *largest combined volumes*, while the cylinder venting chamber **94** is at *its minimum volume*. *This bottom position is also sometimes referred to herein as the "driven position."* . . . *In FIG. 3, the driver **90** is also at its bottom-most travel position.* . . .

Appx355 (12:56-65) (emphasis added). Thus, for a driving stroke, the driver is driven down from a ready position, *i.e.*, its top-most position, to a "driven position," *i.e.*, its bottom-most position, to drive a fastener into a workpiece, and then is lifted back up to continue the operating cycle. Appx307-308 (FIGs. 3, 4); Appx327-328 (FIGs. 20, 21); Appx355-356 (12:56-13:60); Appx362-363 (26:43-27:47). Also, the displacement volume and the main storage volume are at their maximum volumes, while the venting chamber is at its minimum volume. Appx306-307 (FIGs. 2, 3); Appx326-327 (FIGs. 19, 20); Appx355 (12:24-37, 47-51, 56-67); Appx362 (25:33-61, 26:4-8, 43-54). Throughout the specification, this definition does not change – the "driven position" is equated with the "bottom-most position" at the end of a driving stroke.

- 42 -

Kyocera's appeal points to the specification's discussion of the second embodiment to cast doubt on the definition from the first embodiment. Kyocera Br. 21-27. Kyocera relies on the following passage from the specification concerning the second embodiment, with the difference that matters to Kyocera italicized:

> Referring again to FIG. **20**, the piston **458** is depicted *near or at its bottom-most travel position*, and in this configuration, the displacement volume **457** and the main storage chamber **454** are at their largest combined volumes, while the cylinder venting chamber **492** is at its minimum volume. This bottom position is also sometimes referred to herein as the "driven position." . . . In FIG. **20**, the driver **490** is also at its bottom-most travel position . . . .

Appx362 (26:43-53) (emphasis added).

As can be seen from the foregoing, in that embodiment, the "bottom position" is still defined as the "driven position." The specification, however, states that FIG. 20 depicts the piston "near or at its bottom-most travel position."[5] Kyocera distorts the patent specification to suggest that in this embodiment, the definition of the "driven position" has changed; it has not. Rather, FIG. 20 depicts

---

[5]    Kyocera's attempt to rely on that passage is further belied by the fact that the patent elsewhere states "FIG. **3** is another perspective view . . . showing the driver mechanism, with the piston at its lowest "driven" position," and "FIG. **20** is another perspective view . . . showing the driver mechanism, with the piston at its lowest "driven" position." Appx353 (7:42-46, 8:33-37).

- 43 -

the piston "at or near the bottom-most position" and thereby "at or near" the driven position.  Likewise, in both embodiments, the driver is "at its bottom-most travel position," *i.e*, at the driven position.

Tellingly, neither in Commission proceedings nor on appeal has Kyocera pointed to any differences between the first and second embodiments that would afford the "driven position" of the second embodiment a different and broader meaning than in the first embodiment.  Nor can it.  The only difference explained in the patent is that the second embodiment uses a magnetic sensor to sense the movement of the lifter rather than the mechanical pin of the first embodiment.  Appx362 (25:19-26).   Kyocera has never explained—in Commission proceedings and now on appeal—why that difference relates to the driven position (and for Kyocera to attempt to do so for the first time in a reply brief on appeal would be far too late).

Contrary to Kyocera's argument (Br. 23-27), the ALJ's construction does not exclude a preferred embodiment, because the "driven position" of the driver in all of the embodiments is the same.  *See* Appx235.  The ALJ's construction of "driven position" to mean "at the bottom-most travel position" properly accords with the intrinsic record.

**ARGUMENT PERTAINING TO KOKI'S APPEAL**

**I.   THE COMMISSION PROPERLY CONSTRUED THE "LIFTER MEMBER" LIMITATION**

The term "lifter member" appears in representative claim 1 of the '718

patent as follows:

> (vi) a prime mover that moves *a lifter member* which moves a driver member away from an exit end of the mechanism . . . .

Appx577 (37:57-59).  The ALJ defined the term as to mean "a rotatable

component having lifting pins on its face surface."  Appx254.   Koki argues that

the term "lifter member" does not connote structure and should be construed under

section 112, paragraph 6.  Koki Br. 53-61.  Koki, however, casts aside the intrinsic

record and the extrinsic evidence (including from its own expert), which refute

Koki's argument.

The term "lifter member" does not use the word "means," and, accordingly,

it is presumed that the term is not construed as merely functional.  *See Williamson

v. Citrix Online*, LLC, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (en banc).  Moreover,

the specification provides an explicit structural definition for "lifter member":

> Also within the fastener driver portion **14** are mechanisms that will actually drive a fastener into a solid object.  This includes a driver **90**, a cylinder "venting chamber" **94** (which would typically always be at atmospheric pressure), a driver track **98** (see FIG. **4**), a *rotary-to-linear lifter* **100**, and a latch **120**.    The driver **90** is also sometimes referred to herein as a "driver member" and the

- 45 -

> *rotary-to-lifter* **100** *is also sometimes referred to herein as a "lifter member," or simply as a "lifter."*

Appx562 (8:44-52) (emphasis added); *accord* Appx569 (21:19-28) (substantially

the same statement in connection with the second embodiment). Thus, the

specification defines the "lifter member" structurally as a rotary-to-linear lifter, a

term that had an understood structural meaning in the art. *See, e.g.*, Appx250;

Appx1484-1485; Appx1489-1490; Appx1540-1541; Appx1544 (¶¶ 66-67);

Appx1451-1452; Appx1682-1683 (¶¶ 43-44).

Thus, unlike *Bosch*, there is language in the specification here that "defines

the term[] to refer to structure." 769 F.3d at 1100-01; *accord id.* at 1100 ("[O]ne

of ordinary skill could not find in the specification a definition of the terms as

referring to a particular structure."); *see also Mass. Inst. of Tech. v. Abacus

Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) (finding that "the term 'colorant

selection,' which modifies 'mechanism' here, is not defined in the

specification . . ."). This definition alone defeats Koki's argument about means-

plus-function treatment.

But the intrinsic evidence concerning structure goes well beyond the

specification's definition. Taking a step back from the express structural definition

of "lifter member," "lifter" itself connotes structure, and the patent specification

discloses the structural character of the "lifter" through no less than *six* exemplary

embodiments (*i.e.*, lifter **100**, lifter **400**, and lifters **460**, **465**, **470**, and **480**), all

consistent with one another and consistent with the definition of the rotary-to-linear lifter.  Appx562-563 (8:44-52, 67-9:2, 7-17); Appx569 (21:19-28, 22:5-10) (emphasis added); *see also* Appx574 (31:1-63) (lifters **460**, **465**, **470**, **480**); Appx546-549 (FIGs. 30-33 (lifters **460**, **465**, **470**, **480**)); Appx249-251.

In *Inventio AG v. Thyssenkrupp Elevator Americas*, 649 F.3d 1350 (Fed. Cir. 2011), the patentee defeated an assertion of means-plus-function treatment with respect to the term "modernizing device" by demonstrating that:  (1) the claims recite structural detail about the "modernizing device" and how it is connected to other components of the patented system; and (2) the written descriptions identify the "modernizing device" as a structural component, as they provide a block diagram of the modernizing device and also describe the structure and operation of the modernizing device.  *Id.* at 1357.  Similarly, here, the asserted claims recite how—irrespective of the specification's definition—the "lifter member" is connected to the other components, *i.e.*, the "prime mover" and the "driver member," of the patented method for controlling a fastener driving tool.

This Court has recognized the role that expert testimony can play in connection with determining whether a POSA would understand the claim terms to connote sufficiently definite structure or whether they should be subject to means-plus-function treatment.  *See, e.g.*, *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1361-62 (Fed. Cir. 2004) (relying on expert testimony to find

that the claimed "connector assembly" connoted sufficiently definite structure), *overruled on other grounds by Williamson*, 792 F.3d 1339.  In the present case, the expert testimony is also fatal to Koki.  In Commission proceedings, Koki's own expert, Dr. Vallee, took the position that the "lifter member" is a structural term to a POSA in view of the intrinsic record.  Dr. Vallee testified that

> Based on the claims, drawings, and the specification passage above [*e.g.*, Appx525 (FIG. 12); Appx546-549 (FIGs. 30-33); Appx569 (22:5-10)], *skilled artisans would have understood* that "lifter member" *means a rotating element where contact is made at the face surface and not at the outer perimeter*.  The outer shape would have been "*understood*" as unimportant, because no lifting contact is made at the outer perimeter.  Furthermore, because the outer shape is unimportant to the function recited, *skilled artisans would have understood* that the rotating element (that carries the contact surface on its face surface) *can take the form of a gear* (*i.e.*, a rotatable body with a round outer shape) *or a cam* (*i.e.*, any rotatable body with an eccentric outer shape).

Appx248 (quoting Appx1612 (¶ 91)) (emphasis added); *see also* Appx1682-1683 (¶ 43) (Kyocera's expert).

Koki's extensive reliance on *MTD Products Inc. v. Iancu*, 933 F.3d 1336 (Fed. Cir. 2019), is unavailing.  *See* Koki Br. at 54-57.  The Court in *MTD*—like *Williamson*, *Bosch*, *MIT* and other decisions of the Court—expressly stated that "[t]he ultimate question is whether the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6."  *MTD*, 933 F.3d at 1342 (quotation omitted).  In *MTD*, the Court explained that the patent

- 48 -

specification there "does not expressly refer to a 'mechanical control assembly,'" as called for by the claim. *Id.* at 1339. In contrast, as discussed above, the patent specification here is replete with discussion of the "lifter member" including equating "lifter member" and "lifter" with the "rotary-to-linear lifter." *See, e.g.*, Appx562 (8:44-52). Koki's attempt to rely on *MTD* to turn a blind eye to a patent's specification finds no support in *MTD* or any other decision of this Court.

The intrinsic record, as well as the extrinsic evidence, demonstrates that the claimed "lifter member" is a structural term, and Koki has failed to rebut the presumption that this term is not subject to means-plus-function interpretation. Koki does not dispute that its accused products meet this limitation under the ALJ's construction, and the Commission's relevant infringement findings should be upheld.

## II. THE COMMISSION PROPERLY APPLIED THE UNDISPUTED CONSTRUCTION OF THE "INITIATING A DRIVING CYCLE" LIMITATION AND SUBSTANTIAL EVIDENCE SUPPORTS ITS FINDING THAT THIS LIMITATION IS MET BY THE ACCUSED PRODUCTS

The "initiating a driving cycle" limitation appears in representative asserted claim 1 of the '718 patent as follows:

> 1.    A method for controlling a fastener driving tool, said method comprising:
>
> *    *    *

> (c) *initiating a driving cycle by pressing said exit end against a workpiece* and actuating said trigger, thereby causing said fastener driving mechanism to force the driver member to move toward said exit end and drive a fastener into said workpiece . . . .

Appx577 (37:1-61, 38:18-22) (emphasis added). The parties did not dispute that this term should be construed to have its plain and ordinary meaning. Appx49; Appx213-214; Appx230-260; *see also Phillips*, 415 F.3d at 1312-13.

## A.    Koki's Arguments Are Waived and Are Unsupported Attorney Argument

Review of the Commission procedural history here is key to understanding Koki's waiver and unsupported attorney argument that it presents on appeal. Koki Br. 63-77. After the parties agreed to the plain and ordinary meaning of "initiating a driving cycle," the expert report of Koki's expert Dr. Vallee advanced a "new non-infringement theory that was not previously disclosed." Appx3223. That was in violation of the ALJ's Ground Rules, which required Koki to present all of its non-infringement positions in its responses to contention interrogatories. *See* Appx1841-1842 (ALJ's Ground Rule 4.4.3). Accordingly, Dr. Vallee's testimony concerning non-infringement was properly struck, Appx3223. Instead, he only disputed infringement of the '718 patent with respect to two limitations, "system controller" and "lifter member." Appx120 (n.11) (citing Appx3924-3925 (Q/A 317-20)).

With Dr. Vallee's testimony concerning non-infringement of the "initiating a driving cycle" limitation struck, Koki then attempted to rely on bare attorney argument instead to support non-infringement of the "initiating a driving cycle" limitation. Appx3647-3648; Appx3784-3785. The Commission rejected Koki's argument as "unsupported by the record evidence because the ALJ struck the supporting testimony of [Koki's] expert due to waiver." Appx56. The Commission clarified that when Koki's "expert rebuttal testimony went beyond mere rebuttal to introduce a new non-infringement theory regarding this limitation, *i.e.*, that the 'fastener driver mechanism' and the 'safety contact element' cannot be part of the same element, the ALJ properly [rejected] this testimony because it went further than [Koki's] original non-infringement contentions." Appx56. "The Commission thus reject[ed] this argument because no record evidence supports it." Appx56.

Bereft of any testimonial support, Koki now presents fifteen pages of attorney argument concerning non-infringement (Koki Br. 63-78) that points to nothing in the record beyond the specification of the asserted patent. The infringement analysis, however, compares "the properly construed claims to the accused product," *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009), and does not compare the claims to the preferred embodiments of the specification, as Koki tries on appeal. The evidentiary ruling striking Koki's

expert testimony does not give Koki a license to collaterally attack the plain and

ordinary meaning to which it agreed. This Court has similarly set aside such

attacks on claim constructions:

> Tessera does not, nor could it, argue that the Commission adopted an incorrect claim construction. This is because the Commission adopted Tessera's proposed claim construction. Tessera's contention at best is a disagreement over the Commission's application of the Tessera's construction to the accused . . . devices. This court therefore agrees with . . . the Commission that Tessera is challenging the Commission's infringement determination, which this Court reviews for substantial evidence.

*Tessera, Inc. v. ITC*, 646 F.3d 1357, 1364 (Fed. Cir. 2011) (citation omitted and

emphasis removed). Koki never raised these arguments in connection with claim

construction below and they are waived. Appx1460-1636; Appx3140-3213; *see*

*Finnigan*, 180 F.3d at 1362-63 (waiver).

### B.    Substantial Evidence Supports the Commission's Finding of Infringement

Substantial evidence supports the Commission's finding that the accused

products meet the "initiating a driving cycle" limitation. The Instruction and

Safety Manual for the accused products discloses two modes of operation for the

Koki nailer, where for both modes, the end portion of the driving tool, indicated as

the push lever, is depressed against the workpiece to initiate a driving cycle for the

tool. *See* Appx3970; Appx3991-3992. The push lever thus functions as a "safety

contact element," consistent with the agreed-upon construction for that limitation ("a device that when engaged allows operation of the fastener driving tool"), because the tool does not operate unless this lever is depressed. Appx3991; *see also* Appx229. This operation of the accused products is also consistent Dr. Pratt's testimony, which explained that for the accused products, "the exit end of the fastener driving mechanism is the end of the safety contact element, which when pressed against a workpiece, allows a driving stroke to begin." *See* Appx799 (Q/A 203). Substantial evidence thus supports the Commission's finding that this limitation is met.

### C. Notwithstanding Waiver, Koki's Argument That the End of the Safety Contact Element Cannot Be Part of the Fastener Driver Mechanism Is Wrong

Koki's argument on appeal, beyond being waived, misapprehends the intrinsic record. For all embodiments, the specification describes using the "nose" of the safety contact element to actuate the driving tool, *i.e.*, "initiate a driving cycle." For example, with reference to FIG. 1, the specification discloses that "[b]efore the tool is actuated, a safety contact element **32** extends beyond the bottom **30** of the fastener exit, and *this extension of the safety contact element* is depicted at **34**, which is *the bottom or 'front' portion of the safety contact element*." Appx562 (7:47-51) (emphasis added).

The '718 patent then discloses the following to "initiate a driving cycle":

> When it is time to *drive* a fastener [from the "rest" position illustrated above in FIG. **4**], the next action in the illustrated first embodiment is to cause the motor **40** to become energized once again.   This occurs by two independent actions by the user:  in some modes of the invention, these two independent actions can occur in either order. . . . These two actions are:  pressing the *nose 34 of the safety contact element 32 against a solid surface*, and *depressing the trigger actuator* **54**.   The trigger actuator will cause the *trigger switch* **52** to change state, which is one condition that will start sending current to the motor **40**. *The safety contact element* **32** *has an upper arm* **134** (see FIG. **8**) that will be moved as *the nose 34 is pushed into the tool 10*, and this *upper arm 134* will actuate another sensor which, in the illustrated embodiment, is *a second limit switch* **132** (see FIG. **8**). When both of these actions are occurring simultaneously, current is delivered to the motor **40** which will once again turn the rotary-to-linear lifter **100** a short distance . . . to *disengage the latch catching surface* **124** [of latch **120**] from one of the teeth **92** of the *driver* **90**.

Appx564 (11:60-12:15) (emphasis added); *see also* Appx564 (11:48-53); *accord* Appx571 (26:10-37) (for the second embodiment).  Accordingly, for all disclosed embodiments, the '718 patent teaches that pressing the nose of the fastener driving tool, *i.e.*, the nose of the safety contact element, against the workpiece initiates a driving cycle.  It is not initiated, contrary to Koki's argument (Koki Br. 68-74), by pressing the bottom portion of the fastener release exit (*see* bottom **30** described, *supra*) against the workpiece.

Contrary to Koki's argument (Koki Br. 69-76), the '718 patent does not disclose two separate embodiments for "initiating a driving cycle," as the patent only discloses pressing the nose of the fastener driving tool, *i.e.*, the nose of the safety contact element, against the workpiece to initiate a driving cycle for all embodiments as described *supra*. *See, e.g.*, Appx564 (11:48-53, 60-12:15) (first embodiment); *accord* Appx571 (26:10-37) (second embodiment). The passages Koki cited all reference only the safety contact element, not the exit end of the fastener driving mechanism, as triggering the driving cycle. Specifically, these portions of the specification describe initiating a driving cycle upon the *nose* of the safety contact element being depressed into a work surface and its *upper arm* moving to actuate the limit switch. *See* Appx564-565 (12:4-9, 13:37-41); Appx572 (27:54-59). Indeed, the phrases "nose of the safety contact element," "nose of the tool," "nose of the fastener driving tool," "tool nose," or "extension of the safety contact element" are mentioned dozens of times in the '718 specification, all with respect to actuating the tool by pressing the *nose* of the safety contact element into the workpiece (which moves the *upper arm* of the safety contact element to trigger the limit switch).[6] *See, e.g.*, Appx562 (7:47-51);

---

[6]    In addition, Koki references Appx567 (17:8-14) and Appx575 (33:42-47). Koki Br. 69-70. However, those passages merely disclose yet another embodiment

*[Footnote continued on next page]*

Appx564-565 (11:7-12:11; 13:5-22, 37-41; 14:47-50); Appx568 (20:10-14);

Appx571-572 (26:13-54; 27:54-59); Appx514 (FIG. 1); Appx521 (FIG. 8);

Appx532 (FIG. 16); Appx541 (FIG. 25).  Put simply, the safety contact element is

part of the tool's fastener driving mechanism.

This same mischaracterization infects other portions of Koki's argument

(Koki Br. 71-75), where again the specification clearly discloses that it is the

movement of the *upper arm* of the safety contact element, as its *nose* presses

against the workpiece, that triggers the limit switch to "initiate a driving cycle,"

and not some other element that triggers the switch.  *See* Appx572 (27:54-59)

(cited by Koki).  Moreover, all of the logic diagrams for "initiating a driving cycle"

in the '718 patent, on which Koki relies, ask the same logic/decision query:  "Is

Safety Actuated?", but not "Is Exit End Actuated?"  *See, e.g.*, Appx526 (FIG. 13A,

step **224**); Appx551 (FIG. 35A, step **524**).  The specification therefore clarifies that

---

*(cont'd)*
where the *nose* of the safety contact element is pressed against a workpiece, which
moves the *upper arm* of the safety contact element to actuate the limit switch (as
opposed to another element actuating the switch) to start the motor and begin
driving movement of the driver to "initiate a driving cycle."  Appx567 (17:8-14);
Appx575 (33:42-47); *see also* Appx571 (26:22-27).

the safety contact element must be viewed as part of the fastener driving mechanism.[7]

The cases cited in Koki's brief at pages 66-67 are simply inapt. This is not a situation in which the claims contained an error. It is also not a situation in which the claims have been redrafted. Instead, the Commission applied an undisputed claim construction and found infringement. *See Tessera*, 646 F.3d at 1364-66 (affirming the Commission's application of an undisputed claim construction). Koki's attempt to misread the preferred embodiments—long after the time for applying the intrinsic record to the meaning of the patent claims had passed—is unsupported and unsupportable. The Commission's infringement determination should be affirmed.

---

[7]    Even if, *arguendo*, the patent specification includes two different embodiments for "initiating a driving cycle," Koki fails to explain why all the asserted patent claims must incorporate all the limitations of the one particular embodiment to which Koki points (and misapprehends), as opposed to another embodiment. The law does not support Koki. *E.g.*, *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) ("A patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification.").

### III.    THE COMMISSION CORRECTLY APPLIED ITS CONSTRUCTION OF THE "MAIN STORAGE CHAMBER" LIMITATION AND SUBSTANTIAL EVIDENCE SUPPORTS ITS FINDING THAT PEDICINI DOES NOT DISCLOSE THIS LIMITATION

Although obviousness is a question of law based on underlying facts, Koki, on appeal, only disputes the ALJ's factual finding that Pedicini does not disclose the "main storage chamber" limitation.  Koki Br. 78-88.  Accordingly, as Koki itself acknowledges (Koki Br. 88), this Court reviews the Commission's determination for substantial evidence, the absence of which Koki does not demonstrate.

### A.    The Pedicini Prior Art

Pedicini, entitled "Electrical Motor Driven Energy Storage Device For Impacting," discloses a hand-held fastening mechanism tool for driving nails or other fasteners into a workpiece (or substrate).  Appx2466 (¶ 0002).  FIG. 2 of Pedicini is shown below where the driving member (anvil **8**) is shown in a retracted position.



PATENT FIGURE 2

Appx2461 (FIG. 2 of Pedicini).  In accordance with the disclosure and

corresponding drawings, Pedicini discloses delivering a downward driving stroke

using a piston **5** that cycles up and down in the publication's only disclosed air

chamber, *i.e.*, air chamber **13**, all enclosed within a cylinder **14**, where compressed

air forces the piston downward in the chamber to deliver the driving stroke to drive

the fastener **6** into the substrate **18**.  Appx2469 (¶¶ 0077-0078).  As noted in the

"Background of the Invention" section of the '718 patent, Pedicini discloses using

a release valve **23** to replenish the air (from an external source) in the chamber **13** that is lost between nail drives.  Appx2469 (¶ 0077); Appx2461 (FIG. 2); *see also* Appx559 (1:55-56).

### B.    The ALJ's Claim Construction and Finding of Non-Disclosure

Representative claim 1 of the '718 patent recites, in relevant part, "[a] hollow cylinder containing *a displacement volume* created by a stroke of said piston," and "*a main storage chamber* that is in fluidic communication with said displacement volume of the cylinder."  Appx577 (37:63-67) (emphasis added).  As agreed-upon by the parties, the ALJ's *Markman* Order construed the "main storage chamber" limitation to mean "a chamber that is *distinct* from the volume of the cylinder and contains part of the working air volume during operation."  Appx229 (emphasis added).  Based on that agreed-upon claim construction, Koki argued below (Appx136-141) and argues on appeal (Koki Br. 78-83), that the upper portion of the air chamber **13** in FIG. 2 of Pedicini, above the piston **5**, illustrates the recited "main storage chamber" of the asserted claims of the '718 patent, and that the lower portion of the air chamber **13**, below the piston **5**, illustrates the recited "displacement volume."  Appx136-138; Appx3805-3806; Appx2575; Appx2616.  Koki contends that these two portions of the same cylinder, *i.e.*, air chamber **13**, are "distinct" because they are separated by the piston **5** and the piston does not move all the way to the top of the air chamber **13** in its most-retracted

position, *i.e.*, the ready position.  Koki Br. 79, 81, 83-87; Appx3806; Appx1352-

1354 (261:7-263:1).

Substantial evidence supports the ALJ's determination that the alleged

"main storage chamber" in Pedicini above the piston **5** is part of the same volume

within the cylinder **14** as the alleged "displacement volume" below the piston **5**.

*See, e.g.*, Appx136-141; Appx563 (9:57-10:3); Appx515 (FIG. 2); Appx518 (FIG.

5); Appx559 (2:19-26); Appx564-565 (12:50-13:4); Appx2469 (¶¶ 0077-0078);

Appx2460 (FIG. 1 of Pedicini).  Koki argues that the ALJ "erred by not finding

that the 'volume of the cylinder' in the agreed-upon construction of 'main storage

chamber' *refers only to that volume through which the piston moves from its upper

position to its driven position*."  Koki Br. 82-83 (emphasis added).  But if that is

what Koki sought, it should have so argued in claim construction proceedings,

instead of seeking, in the guise of non-infringement, rewriting the construction.

The '718 patent does not disclose two cylinders, with one cylinder representing the

portion above wherever the piston happens to be located at a point in time, and

another the portion below the piston; it is all a single cylinder.  Substantial

evidence supports the Commission's factfinding that Pedicini has only one

cylinder and that the alleged main storage chamber in Pedicini is not distinct from

that cylinder.[8] Pedicini therefore does not disclose a "main storage chamber" having a volume that is necessarily distinct from the volume (or displacement volume) of the cylinder, consistent with the agreed-upon construction.

In its brief, Koki relies upon *Phillips* to contend that the ALJ improperly read an embodiment from the '718 patent specification into the claims. Koki Br. 82-83. Specifically, Koki argues that the ALJ improperly limited his application of the agreed-upon construction to the disclosed embodiment where the main storage chamber "substantially surrounds" the cylinder **71** of the driving tool. *See* Appx562-563 (8:37-41, 10:13-15). That reliance is unavailing because the ALJ did not limit his analysis to this specific embodiment of the '718 patent, but to the agreed-upon construction of the "main storage chamber" limitation, which by its words, limits the volume to the "*volume of the cylinder*," *i.e.*, the volume within the cylinder. Appx229 (emphasis added). It is Koki who is attempting to broaden

---

[8]     Moreover, Pedicini is not replenishing the air in the chamber **13** using the area above piston **5** as a gas replenishment source, *i.e.*, a main storage chamber, but rather this area is simply part of the overall volume of the air chamber **13** that is replenished using an external supply. Appx2469 (¶ 0077). In contrast to Pedicini's configuration, the '718 patent uses a "working storage volume" that provides a substantially gas-tight system and comprises a combination of a main storage chamber **74** and a cylinder displacement volume **76**; this combination avoids the use of a gas replenishment system on-board the driving tool, or an external supply, by self-replenishing using gas (or air) from the main storage chamber and feeding it to the upper portion of the cylinder **71** via a fluidic passage **152**. Appx559 (1:61-62, 2:19-26); Appx564-565 (12:50-13:4).

this agreed-upon construction by reading out the word "distinct" from the construction—contrary to the agreed-upon construction.

Based on the foregoing, substantial evidence supports the Commission's determination that Pedicini does not disclose the "main storage chamber" limitation, and therefore Koki has not met its burden to establish, by clear and convincing evidence, that the asserted claims of the '718 patent are rendered obvious by the Pedicini combination.

## IV.    THE COMMISSION DID NOT ABUSE ITS DISCRETION WHEN IT CONSIDERED KYOCERA'S EXPERT TESTIMONY PERTAINING TO LITERAL INFRINGEMENT AND INVALIDITY

The ALJ's exclusion of Dr. Pratt's testimony concerning infringement under the doctrine of equivalents is discussed above in connection with Kyocera's appeal.  Koki argues, in its cross-appeal, that Dr. Pratt's testimony should have been excluded in connection with literal infringement and invalidity.  Koki Br. 61-63.  Koki fails to demonstrate, however, that the ALJ's allowance of the testimony was "manifest error."  *Montgomery Ward*, 594 F.3d at 1373.

First, Koki's argument (Koki Br. 61-63) is waived here as untimely.  *See, e.g.*, *Finnigan Corp.*, 180 F.3d at 1362-63.  In Koki's contingent petition for Commission review of the ALJ's determinations, Dr. Pratt is mentioned 85 times.

The only discussion of Dr. Pratt's lack of skill in the art is on page 4 of Koki's petition:

> As a matter of law, the Chief ALJ's reliance on Dr. Pratt's testimony was improper.  After issuing Order No. 9, the Chief ALJ determined that Dr. Pratt "does not qualify as a person of ordinary skill in the art."  Given the Chief ALJ's subsequent finding that Dr. Pratt is not a person of skill in the art, the Chief ALJ's prior reliance on Dr. Pratt's testimony on issues of claim construction should be given no weight.

Appx4082 (citation omitted).  Koki knew how to raise the issue of Dr. Pratt's qualifications as to claim construction, but it did not do so for direct infringement or obviousness.  Accordingly, Koki's arguments are forfeited on appeal.

Notwithstanding waiver, the ALJ's determination to allow Dr. Pratt's testimony for literal infringement and obviousness was not manifest error.  As this Court explained in *Montgomery Ward*, the tribunal below is in the best position to judge whether a proposed expert has the "'knowledge, skill, experience, training, [and] education' of a 'specialized' nature that was likely to 'assist the trier of fact to understand the evidence or to determine' infringement."  *Montgomery Ward*, 594 F.3d at 1373 (quoting Fed. R. Evid. 702).  The issues of direct infringement and obviousness (as to the factual questions of the scope and content of the art, and comparison of the prior art to the claims) were straightforward, unlike infringement under the doctrine of equivalents, as explained in *AquaTex*, 479 F.3d at 1329.  The ALJ did not manifestly err in allowing Dr. Pratt to testify about the

accused device and the prior art for literal infringement and obviousness, respectively, while preventing Dr. Pratt from testifying as to infringement under the doctrine of equivalents.

As this Court recognized in *AquaTex*, literal infringement is simpler for the factfinder than infringement under the doctrine of equivalents, and less reliant on the views of a person of ordinary skill. *AquaTex*, 479 F.3d at 1328-29. In the present case, for literal infringement the ALJ performed a "visual inspection" of the accused products to determine whether the limitations of the asserted claim limitations were found in the accused products. *E.g.*, Appx44; Appx182-183 (n.7). The ALJ also considered the accused products' literature to determine that limitations were met. *See* Appx174-175; Appx182-183. The ALJ did not manifestly err in allowing Dr. Pratt to point the ALJ to present the accused products or their instructions for the ALJ's own inspection of them.

As to obviousness, the issue challenged by Koki on appeal relates to the teachings of Pedicini. Whether the issue is framed as the scope and content of the prior art or comparing that prior art with the patent claims, the issue is one of fact. *Norgren*, 69 F.3d at 1322. That inquiry is analogous to literal infringement. In particular, in the present case, the ALJ evaluated the figures of Pedicini to determine that Pedicini does not disclose the recited "main storage chamber." Appx136-141.

Infringement under the doctrine of equivalents is a vastly different inquiry, requiring, on a limitation-by-limitation basis, "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process, or with respect to the function, way, result test," *AquaTex*, 479 F.3d at 1328 (quotation and emphasis omitted), all from the perspective of a POSA, *id.* at 1329.  In so recognizing that the doctrine of equivalents inquiry was different here from the inquiry for literal infringement or obviousness, the ALJ did not manifestly err.  The ALJ's evidentiary determinations should be upheld.

## CONCLUSION

The Commission respectfully requests that its final determination be affirmed.

Respectfully submitted,

/s/ *Clint A. Gerdine*
DOMINIC L. BIANCHI
General Counsel
SIDNEY A. ROSENZWEIG
Acting Assistant General Counsel
CLINT A. GERDINE
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
(202) 708-2310

Date:  April 23, 2021

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE, AND TYPE STYLE REQUIREMENTS

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Federal Circuit Rule 32(b)(3), I hereby certify that the attached brief complies with the type-volume limitation and typeface requirements of Federal Rule of Appellate Procedure 32(a)(7) and Federal Circuit Rules 32(b)(1) and 32(b)(2). The brief has been prepared in a proportionally-spaced typeface using Microsoft Office 365 ProPlus, in Times New Roman 14-point font. The brief contains a total of 13,925 words, including 13,732 words obtained from the word-count function of the word-processing system, including all footnotes and annotations, and a manual count of 193 words appearing in the graphics and images.

*/s/ Clint A. Gerdine*
Clint A. Gerdine
Attorney Advisor
Office of the General Counsel
U.S. International Trade
Commission 500 E Street, SW
Washington, DC  20436
Tel: (202) 708-2310
Fax: (202) 205-3111
Clint.Gerdine@usitc.gov

*Counsel for Appellee*
*International Trade Commission*

## CERTIFICATE OF SERVICE

I, Clint A. Gerdine, hereby certify on this 23rd day of April 2021 that I filed

the attached **BRIEF OF APPELLEE INTERNATIONAL TRADE**

**COMMISSION** using this Court's CM/ECF system, which will serve the brief on

all counsel of record.

/s/ *Clint A. Gerdine*
Clint A. Gerdine
Attorney Advisor
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 708-2310
Fax: (202) 205-3111
Clint.Gerdine@usitc.gov

*Counsel for Appellee*
*International Trade Commission*